UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DAVID URIEL ABRAMI, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 09-30176-DPW |
| | ) | |
| v. | ) | |
| | ) | |
| TOWN OF AMHERST, CHARLES L. | ) | |
| SCHERPA, MARCUS A. HUMBER, | ) | |
| and RYAN N. TELLIER, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER
July 16, 2013

Plaintiff David Abrami has brought an extensive array of
claims against the Town of Amherst, police officers Marcus Humber
and Ryan Tellier, and police chief Charles Scherpa.  After
thoroughly reviewing a summary judgment record that does not
include plaintiff's belatedly filed interrogatory answers which I
will order stricken, I conclude that none of his claims can
survive summary judgment on this record.

**I. BACKGROUND**

**A.   *Factual Background*[1]**

On the evening of September 30, 2006, Abrami was hosting a
birthday party in his second-floor apartment at 220 North

_____

[1] As discussed in Part II *infra*, this factual background
drawn from the evidence of record does not include the
interrogatory answers belatedly filed by the plaintiff.

Pleasant Street in Amherst.  The apartment is one of five in a mixed use commercial building.  Music was playing from speakers in the living room, and the windows of the apartment were open. Abrami recounted that he had about 20 guests, who were "in every part of the apartment" eating, playing pool, talking, and dancing.

Shortly after one o'clock in the morning on October 1, Amherst police received a complaint from another building resident about a loud party in the building.  Officer Humber, who responded to the call, could hear loud music as he approached the residence.  Humber knocked on the apartment door, and announced that he was an Amherst police officer.  Vladimir Caseres, one of the party guests in the living room, opened the door because Abrami was in his bedroom at that time.  Humber told Caseres to turn down the music and asked to speak with a resident.

Caseres retrieved Abrami from the bedroom.  According to Abrami, when he went through living room to go to the door, the music had been turned off.  Despite the apartment's thin walls, Abrami says he did not notice the music being turned off while he was in the bedroom.  That is because, he says, the music was not very loud; one could speak at "normal conversational volume."  In any event, Abrami could think of no reason why the music would have been shut off other than the fact that Officer Humber had arrived.

The circumstances of Abrami's exchange with Humber at the door are not entirely clear.  According to Abrami's testimony at his deposition, he tried to step into the corridor to speak with Humber, and tried to close the door behind him.  At that point, Humber moved in towards Abrami, commanded that the door be left open, and placed his foot in the doorjamb to ensure that the door did not close.  Humber then asked Abrami for identification.

Humber's report of these events was slightly different. Humber recounted that Caseres initially attempted to shut the door before he went to retrieve Abrami, but Humber instructed him to leave it open "for officer safety issues."  When Abrami arrived at the door, Humber asked him to get his license, to ask his guests to leave, and again asked that the music be turned down--suggesting that it had not been turned off in response to his first request.  Abrami then tried twice to shut the door, but Humber again commanded that the door remain open.  Humber reported that he explained to Abrami:  "I was on the call by myself, [Abrami] had an apartment full of people, and it's an officer safety issue."  At some point Humber placed his foot in the doorjamb, thwarting another attempt by Abrami to shut the door.

Abrami's guests began leaving the party as Abrami retrieved his ID from his bedroom.  By the time Abrami returned to the entrance, Officer Tellier had arrived, and Humber was asking the

party guests to leave.  Abrami complained that Humber was trying to make his guests drive home drunk, something he said the Amherst police made a habit of doing when they broke up college parties.  Humber then arrested Abrami for the noise violation.

Humber handcuffed Abrami and escorted him down the stairs. Abrami complained about pain in his shoulders, but said that the pressure was relieved once they arrived downstairs.  He did not request medical attention.  Abrami was taken to the police station, where he remained for about three hours before being bailed out by one of his party guests.

Humber applied for a criminal complaint against Abrami for violation of the Amherst Town Noise Bylaw, Article II, Prohibitions § 3 (hereinafter, "A.T.B.L. art. 2, § 3"); the complaint issued on October 5, 2006.  Abrami failed to make a scheduled appearance in court on December 6, 2006.  He was arrested on a resulting warrant on February 16, 2007, and spent a night in jail before appearing in court the next day.  On December 4, 2007, following a bench trial in Hampshire District Court, the matter was decriminalized, Mass. Gen. Laws ch. 277, § 70(c), and Abrami was found not responsible.

Meanwhile, on October 30, 2006, Abrami filed a civil complaint with the Amherst police department charging Humber with police misconduct.  After Abrami and Caseres failed to respond to interview requests from the police department, the department

-4-

denied Abrami's complaint on February 21, 2007.  By letter dated
March 22, 2007, Abrami appealed the department's disposition of
his complaint to the Town.  Following review on the merits, the
Town found that Humber had not engaged in misconduct in his
handling of the noise complaint on October 1.

On July 30, 2009, at about 1:30am, Humber responded to
another noise complaint at Abrami's residence.  This time, he
left Abrami with a warning.

**B.   *Procedural History***

Abrami brought this action in Hampshire Superior Court, and
it was removed to this court on October 15, 2009.  Judge Ponsor,
who was previously assigned to this matter, dismissed the case in
February 2011, following plaintiff's failure--despite two
extensions of time--to file an opposition to defendants' motion
for summary judgment.  He also denied Abrami's motion for
reconsideration, which was accompanied by a belated opposition to
summary judgment and untimely answers to interrogatories.

The First Circuit vacated the dismissal, based at least in
part on the "potential merit" of Abrami's claim for unlawful
entry and his claim that the police lacked probable cause for his
arrest.  *Abrami* v. *Town of Amherst*, No. 11-1384, Judgment, at 3
(1st Cir. Jan. 14, 2013).

After being assigned the matter on remand, I afforded
defendants the opportunity to file a reply brief in support of

-5-

summary judgment.  Defendants also filed a motion to strike
Abrami's belated interrogatory responses.  After a hearing on the
motions, I allowed Abrami to file supplementary authorities
regarding his constitutional challenge to the Amherst Noise
Bylaw.

I now take up defendants' motion to strike, Dkt. No. 49,
before addressing their motion for summary judgment, Dkt. No. 21.

## II. MOTION TO STRIKE

Defendants served their interrogatories on Abrami on June
30, 2010, pursuant to the deadline for written discovery.
Abrami's response was due within 30 days thereafter, Fed. R. Civ.
P. 33(b)(2).  Abrami, however, did not file his interrogatory
responses until February 15, 2011, when they were offered as an
exhibit to his also-tardy opposition to defendants' motion for
summary judgment.  The interrogatory responses were thus untimely
filed, and striking them is justified on this ground alone.  *See*
Fed. R. Civ. P. 37(b)(2)(A)(iii), (d)(3).  The First Circuit
recognized that Abrami had no legitimate excuse for the nearly
month-long delay in opposing the motion for summary judgment.
*Abrami* v. *Town of Amherst*, No. 11-1384, Judgment, at 2 (1st Cir.
Jan. 14, 2013).  Abrami has failed to provide a reason why his
interrogatory responses were untimely by many more months.

Although the First Circuit concluded that outright dismissal
of Abrami's claims would be unduly harsh, I conclude the balance
of equities with regard to allowing his late interrogatory

-6-

responses as part of the summary judgment record is quite
different.  Plaintiff's delay with respect to the interrogatory
responses, for example, was far more egregious.  Defendants were
left to develop their case without the benefit of interrogatory
responses to which they were entitled, and moved for summary
judgment on what they rightfully understood to be a closed
factual record.

Moreover, there is legitimate concern that the interrogatory
responses are at least partially contrived or exaggerated.  For
example, in response to an interrogatory regarding the claim for
unlawful entry, Abrami for the first time recounted that Humber
"suddenly and deliberately lunged forward towards me forcing
myself into my apartment while I cowered backwards, preventing
the door from being closed."  That account directly conflicts
with the report of police misconduct Abrami filed with the
Amherst police department shortly after the incident in October
2006, and Abrami's own deposition testimony in this case, both of
which reflect that Humber did nothing more than place his foot in
the doorjamb of Abrami's apartment.

This blatant effort to supplement and supercharge the
summary judgment record after the record was closed with
interrogatory responses so suddenly and conspicuously different
from prior reports cannot be tolerated--at least absent some
explanation for the disparity; but that is lacking here.  *See
Cleveland* v. *Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)
("[A] party cannot create a genuine issue of fact sufficient to

survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."); *accord Colantuoni* v. *Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994).

Based on Abrami's unexcused failure to comply with the court-ordered discovery schedule in a timely fashion, together with concerns that his interrogatory responses are a contrivance to create genuine issues of fact at summary judgment, I will grant defendants' motion to strike and decline to consider the answers in connection with resolving the motion for summary judgment.

### III. SUMMARY JUDGMENT MOTION

Abrami brings fourteen claims ranging from allegations of constitutional violations actionable under § 1983, to state statutory and common law claims, to a facial challenge to the Noise Bylaw itself.  Defendants have moved for summary judgment on all counts.

Fed. R. Civ. P. 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).  The question

-8-

is whether, viewing the facts in the light most favorable to the nonmoving party, there is a "genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); *Casas Office Machines, Inc.* v. *Mita Copystar Am., Inc.*, 42 F.3d 668, 684 (1st Cir. 1994).

I discuss each count in turn, although for clarity and convenience I divide discussion of Count I into two parts.

## A.  *Count I - Warrantless Search and Seizure*

Count I incorporates a variety of allegations against Officer Humber.  In this section, I address the allegations that Humber violated the Fourth Amendment by entering Abrami's home without a warrant, and that Abrami's arrest was thereby tainted by unlawful entry.  I conclude that defendants are entitled to summary judgment on these aspects of Count I on the basis of qualified immunity.  I discuss Count I's remaining allegations in Part III.B *infra.*

### 1.  Unreasonable Search and Seizure

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable," absent exigent circumstances. *Payton* v. *New York*, 445 U.S. 573, 586-87 (1980) (internal citation omitted).  There is no dispute that Humber had no warrant when he arrested Abrami on October 1, 2006.

Defendants, however, argue that concerns about warrantless entry are not implicated because Humber did not enter Abrami's

home; rather, he placed his foot in the doorjamb at the threshold of Abrami's home.  In its remand order, the First Circuit observed that the door to Abrami's apartment opened inward, indicating that Humber must have crossed the threshold into the apartment in order to keep the door open.

The Supreme Court has recently reaffirmed that the Fourth Amendment protects against purely trespassory intrusions, no matter how minimal.  *See United States* v. *Jones*, 132 S. Ct. 945, 949-51 (2012); *Kyllo* v. *United States*, 533 U.S. 27, 37 (2001) ("physical invasion of the structure of the home, by even a fraction of an inch, [is] too much" (internal quotation omitted)).  There is thus a genuine dispute whether Humber's foot crossed the threshold into Abrami's apartment, and thus whether Abrami's Fourth Amendment rights were violated under a purely trespassory theory of unlawful entry.

It would trivialize the Fourth Amendment, however, to find that Abrami's rights under these circumstances depended entirely on whether his door turned inward or outward.  As the Seventh Circuit has observed: "exactly where outside ends and where the home begins is not a point immediately obvious.  Splitting fractions of an inch can be a very treacherous endeavor, producing arbitrary results." *Sparing* v. *Vill. of Olympia Fields*, 266 F.3d 684, 689 (7th Cir. 2001).  Fortunately, then, "we need not pull out our rulers and begin to measure" because the point of intrusion into the home in violation of the Fourth

-10-

Amendment may also be "identified by inquiry into reasonable expectations of privacy." *Id.*  On the record before me, there is a genuine dispute as to whether Humber violated Abrami's reasonable expectations of privacy.

The Supreme Court recently confirmed, albeit in dictum, that "even if an occupant chooses to open the door and speak with [police officers, lacking a warrant, who had knocked on his door], the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." *Kentucky* v. *King*, 131 S. Ct. 1849, 1862 (2011).  Even prior to *King*, courts had recognized that

> [a]nswering a knock at the door is not an invitation to come in the house.  We think society would recognize a person's right to choose to close his door on and exclude people he does not want within his home.  This right to exclude is one of the most--if not the most--important components of a person's privacy expectation in his home.

*United States* v. *Berkowitz*, 927 F.2d 1376, 1387 (7th Cir. 1991). By opening the door to police officers before they have announced their authority to arrest, "the arrestee has not forfeited his privacy interest in the home; he has not relinquished his right to close the door on the unwanted visitors." *Berkowitz*, 927 F.2d at 1387; *cf. also United States* v. *Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986) ("A suspect does not consent to being arrested within his residence when his consent to the entry into his residence is prompted by a show of official authority."); *McKinney* v. *George*, 726 F.2d 1183, 1188 (7th Cir. 1984) (finding

no Fourth Amendment violation where suspect opened door to police
and complied when police told him to come with them, but noting
that if suspect "had refused and [police] had come in and taken
him we might have a different case"); *United States* v. *Reed*, 572
F.2d 412, 423 n.9 (2d Cir. 1978) ("We do not believe that the
fact that [the suspect] opened the door to her apartment in
response to the knock of three armed federal agents operated in
such a way as to eradicate her Fourth Amendment privacy
interest.").

Here, viewing the facts most favorably to Abrami, there is a
genuine dispute whether Humber violated Abrami's reasonable
expectations of privacy by requiring that the apartment door
remain open.  The facts most favorable to Abrami are, oddly
enough, those recounted by Humber himself.  According to the
report Humber filed about the incident, Abrami responded to
Humber's engagement by attempting to "shut the door in [his]
face"--an unequivocal attempt by Abrami to exercise his right of
privacy in the home.  Although all agree that Abrami voluntarily
came to the apartment entrance, he did not thereby necessarily
lose the right to close the door.  That conclusion is only
reinforced by the fact that the door was open when Abrami came
into the living room only because Humber had previously prevented
Caseres from closing it.

By contrast, signs of consent to the encounter are present in Abrami's account of the incident, in which he recalls trying to step out into the hallway to speak with Humber.  At that point, Humber would have had full authority to arrest Abrami in the public corridor, assuming the arrest was otherwise proper, as I conclude it was in Part III.B *infra*.  But no arrest was made at that point and, when Abrami went back into his apartment, the door remained open only at Humber's command.

The difference between Humber's report and Abrami's testimony may be relevant, however, as to whether Humber made only a warrantless "entry" by requiring that the door remain open, or whether the eventual arrest was also unlawful.  To the extent Abrami emerged from the apartment or continued to engage with Humber only as a result of coercive police conduct, his eventual arrest is problematic from a Fourth Amendment perspective regardless of whether the arrest was effected in the public hallway or in plain view at the entrance to his door. *United States* v. *Thomas*, 430 F.3d 274, 277-78 (6th Cir. 2005) (discussing distinction between consensual doorstep encounter and coercive "constructive entry"); *United States* v. *Morgan*, 743 F.2d 1158, 1166 (6th Cir. 1984) (same).  Even after some initial exchange between Humber and Abrami, assuming Humber had not yet sought to place Abrami under arrest, Abrami was free to withdraw his consent to the encounter.  *See King*, 131 S. Ct. at 1862; *Berkowitz*, 927 F.2d at 1387.  *Compare United States* v. *Santana*,

427 U.S. 38, 42 (1976) (arrestee could not thwart proper arrest in public place by retreating into house).

But to the extent Abrami was simply trying to close the door to his apartment while both freely cooperating with Humber's investigation into the noise complaint and voluntarily exposing himself to public view--for example, by returning to the entrance of the apartment with his ID or re-entering the hallway at that point--the arrest itself cannot be deemed unlawful.  Rather, the Fourth Amendment harm in those circumstances is limited to Humber's warrantless entry--either literally by crossing the apartment threshold with his foot, or by the continued "search" effected by "visual entry into the room through the door that was opened at [his] command," *United States* v. *Winsor*, 846 F.2d 1569, 1573 (9th Cir. 1988)--to the extent entry was unnecessary to effect the doorway arrest.  *Compare United States* v. *Crapser*, 472 F.3d 1141, 1148 (9th Cir. 2007) (condoning non-coercive "knock and talk" at threshold of home, but still requiring consent to search home); *United States* v. *Gori*, 230 F.3d 44, 57 (2d Cir. 2000) (after door was opened to food delivery person officers permissibly engaged in brief investigatory seizure of residents in view; officers nevertheless obtained consent before searching apartment).

### 2.  Exigent Circumstances

There remains the question whether Humber's warrantless entry might nevertheless have been reasonable due to exigent circumstances.

-14-

Although Mass. Gen. Laws ch. 41, § 98, permits warrantless entry to quell disturbances, any such authority is limited by Fourth Amendment safeguards and standards for warrantless entry only in exigent circumstances. *Commonwealth* v. *Kiser*, 724 N.E.2d 348, 352 (Mass. App. Ct. 2000). The Sixth Circuit has held that a late night disturbance "might well present exigent circumstances" justifying warrantless entry and arrest. *United States* v. *Rohrig*, 98 F.3d 1506, 1520 (6th Cir. 1996). The *Rohrig* court found a compelling governmental interest supporting warrantless entry where "strict adherence to the warrant requirement would subject the community to a continuing and noxious disturbance for an extended period of time without serving any apparent purpose," especially when balanced against a person's "substantially weakened interest in maintaining the privacy of his home [when] . . . projecting loud noises into the neighborhood in the wee hours of the morning, thereby significantly disrupting his neighbors' peace." *Id.* at 1522.

However, I cannot find such an exigency on the summary judgment record before me. *Rohrig* describes the scene of a neighborhood up in arms over an extended disturbance of the peace, which continued even after officers arrived on the scene because they were impotent to take action without a warrant. *Id.* at 1509, 1522. Here, taking the facts most favorably to Abrami, the music was turned off as soon as--or at least shortly

after--Humber arrived on the scene.  *Cf. Kiser*, 724 N.E.2d at 352
(finding no exigency when resident agreed to turn down music).

Humber also presents vague concerns about "officer safety,"
but it is not clear what concerns posed exigent circumstances.
There is no indication that the situation was spinning out of the
control, as in cases where officers at the threshold observe
people running in and out of the home or scurrying around within
the home, or where circumstances otherwise indicate that those
inside the home are preparing to harm the officers.  *See, e.g.*,
*United States* v. *Newman*, 472 F.3d 233, 238 (5th Cir. 2006).
Neither did the nature of the crime suggest that violent
confrontation was imminent due to weapons or malicious characters
inside the apartment.  *Compare id.* (discussing reasonable
inference that firearms present at drug transaction).  And Abrami
did not say or do anything in response to Humber that might
indicate he posed an immediate threat of harm to Humber or
others.  *Compare Ryburn* v. *Huff*, 132 S. Ct. 987, 991 (2012)
(officers reasonably perceived that violence was imminent when
resident turned and ran into home following question whether
there were guns in the house; under those circumstances resident
had not "merely asserted her right to end her conversation with
the officers and returned to her home").  In short, when Abrami
exercised his right to close the door on Humber the encounter
simply should have ended--along with any concerns about the

safety of engaging Abrami and his guests within the apartment.
If Humber thought it necessary, he could have left to obtain a
warrant and returned with backup. *Cf. Berkowitz*, 927 F.2d at
1388.

   3.  <u>Qualified Immunity</u>

   Humber nevertheless seeks the protection of qualified
immunity, to which he is entitled unless "the facts alleged or
shown by the plaintiff make out a violation of a constitutional
right," and such right was "'clearly established' at the time of
the defendant's alleged violation." *Maldonado* v. *Fontanes*, 568
F.3d 263, 269 (1st Cir. 2009).  The qualified immunity standard
is "not a stringent test" and "gives ample room for mistaken
judgments by protecting all but the plainly incompetent or those
who knowingly violate the law." *Rivera* v. *Murphy*, 979 F.2d 259,
263 (1st Cir. 1992) (internal quotation and citation omitted).

   I do not accept defendants' argument that qualified immunity
in this case derives from uncertainty as to whether Humber
"crossed the threshold" into Abrami's apartment by placing his
foot in the doorjamb.  The Supreme Court has made clear that the
Fourth Amended is implicated by an officer who even "barely
cracks open the front door." *Kyllo*, 533 U.S. at 37.  And there
can be no question that a stranger would have committed common
law trespass on Abrami's property by placing his foot in the
doorjamb and holding the door open without Abrami's consent.

-17-

Nevertheless, even on the record before me taken most favorably to Abrami, Humber is properly shielded by qualified immunity based on the unsettled state of an officer's authority to arrest or otherwise seize a suspect inside the doorway to his house but in plain view.  The principle underlying an officer's authority to effect doorway arrests or investigatory seizures, on which Humber reasonably relied, is that there is some extent to which one forfeits expectations of privacy in the home by freely exposing himself to public view.  *See generally Santana*, 427 U.S. at 42; *Gori*, 230 F.3d at 52; *United States* v. *Vaneaton*, 49 F.3d 1423, 1426 (9th Cir. 1995).  Reasonably implicit in the notion of a doorway arrest is some degree of access to the home as necessary to effect the arrest.

The contours of an officer's authority and a suspect's rights in the context of a doorway seizure are not well defined. Some courts, for example, have found that a suspect opening the door to the police does not relinquish his right of privacy in the home unless he acquiesces in detention, while others have found that acquiescence is not required.  *See Gori* 230 F.3d at 52 (collecting cases).  Some courts have also indicated that a suspect's rights may differ when the door is opened to law enforcement, as opposed to a lay invitee.  *See id.* at 52 n.4. But the various approaches to doorway seizures only serve to reinforce that Abrami's rights, when he voluntarily presented

3c324791c13b529f

himself to Humber through the doorway, were not clearly

established.   Indeed, the substantial uncertainty surrounding

doorway seizures has formed the basis for qualified immunity in

the past.   *Cf. Joyce* v. *Town of Tewksbury*, 112 F.3d 19, 22 (1st

Cir. 1997) (en banc) ("Even a quick review of lower court cases

reveals that there is no settled answer as to the

constitutionality of doorway arrests."); *Sparing* v. *Vill. of

*Olympia Fields*, 266 F.3d 684, 691 (7th Cir. 2001).

I conclude that, on the facts most favorable to Abrami,

Humber mistook the extent to which Abrami had relinquished his

expectations of privacy in the home (and effectively consented to

entry) merely by voluntarily coming to the door and placing

himself in public view.[2]   But Humber's mistake was reasonable,

given the considerable uncertainty surrounding the rights of

suspects engaged in doorway interactions with law

---

[2] Importantly, the warrantless entry in this case occurred
well before Humber sought to place Abrami under arrest.   Even
where courts have not required acquiescence prior to entry into
the home, warrantless entry has invariably followed an
announcement by the police that the suspect was under arrest.
*E.g.*, *United States* v. *Carrion*, 809 F.2d 1120, 1128 (5th Cir.
1987) (not requiring acquiescence, but entry still followed
arrest); *United States* v. *Herring*, 582 F.2d 535, 543 (10th Cir.
1978) (same).   Needless to say, the same is true in courts
requiring acquiescence.   *See Berkowitz*, 927 F.3d at 1386
(collecting cases permitting warrantless entry where officers
"*announce from outside the home the person is under arrest* when
he opens the door to answer, and the person acquiesces to the
arrest" (emphasis added)).   The First Circuit itself in *Joyce*
expressed skepticism regarding warrantless entry in cases "where
an arrest is not already in progress, or where the offense is
truly trivial." *Joyce*, 112 F.3d at 22.

enforcement--with respect to their Fourth Amendment protection against both an arrest or investigatory seizure and any accompanying entry into the home.   Moreover, Humber accompanied his reasonable mistake about the extent to which Abrami had forfeited his expectations of privacy with the proportionally modest entry of requiring that the door to the apartment remain open while he conducted an investigatory doorway seizure.

Humber is thus entitled to qualified immunity.   On this basis, summary judgment must enter on the aspects of Count I alleging unlawful entry, as well as those alleging that Abrami's arrest was unlawful as a result of any such entry.

## B. *Count I - Remaining Allegations*

Most of Abrami's other claims require considerably less effort to resolve, and the remainder of the allegations in Count I are no exception.

### 1. Probable Cause

Abrami argues that Humber lacked probable cause to believe that the Amherst Noise Bylaw had been violated, rendering his arrest invalid.   The Bylaw prohibits "excessive, unnecessary, or unusually loud noise which either annoys, disturbs, injures, or endangers the reasonable quiet, comfort, repose, or the health or safety of others within the town of Amherst."   A.T.B.L. art. 2, § 3(1).   The Bylaw specifically calls out the use of "electronic sound producing devices, in such a manner or with volume at any

-20-

time or place so as to annoy or disturb the reasonable quiet, comfort or repose of persons in any dwelling." *Id.* § 3(1)(a).

The noise complaint received from a neighbor goes a long way toward establishing probable cause based on disturbance of the reasonable quiet of someone in another dwelling.  So too does Humber's report that he could hear loud music as he approached the residence.

In remanding this case, the First Circuit indicated that Abrami's argument had potential merit based on his testimony that the music was not too loud and that people at the party could speak "in a normal conversational volume."  But the court refrained from taking a position as to whether this created a genuine dispute of material fact.  I conclude that it does not.

Whatever Abrami may have perceived a "normal conversational volume" to be from inside the party, this testimony cannot overcome the evidence creating probable cause that, *outside* the apartment, noise from the party was causing a disturbance.  Noise from the party was at least loud enough to lead Humber to the party even without knowing Abrami's apartment number.  Abrami also admitted that the windows were open, making noise from the party more likely to disturb the peace outside.

Moreover, the nature of the party Abrami described is some evidence that noise from the apartment was loud enough to create probable cause of a Noise Bylaw violation.  The party guests had

not come by just to have a drink and a quiet chat.  Rather,

Abrami described people "in every part of his apartment" engaged

in lively dancing, cooking and eating, and playing pool.

Although there was no "hired DJ," Caseres had apparently invited

someone specifically to choose and play music.

The doctrine of qualified immunity also entitles Humber to

reasonable latitude in concluding that noise from the party was

loud enough to violate the Bylaw, even if it was in fact

insufficiently disruptive to constitute a violation.  Even if the

evidence can be called marginal as to probable cause, Humber is

shielded by qualified immunity in drawing the conclusion that

probable cause was present.[3]

---

[3] Abrami also argues that, regardless of probable cause,
Officer Humber lacked authority under Massachusetts law to detain
him.  Absent statutory authorization, he says, Massachusetts
prohibits warrantless arrests for misdemeanors unless the
violation is continuing at the time of arrest.  *See Commonwealth*
v. *Jacobsen*, 644 N.E.2d 213, 215 (Mass. 1995).  Defendants
respond that the Town Noise Bylaw provides just such
authorization for any violation that "occurs in the presence or
view of any officer," without any "continuing violation"
requirement.  A.T.B.L. § 3(4)(b).  The thrust and parry
continues, with Abrami arguing that such authority must come from
the *state*, not merely the town.  *Compare* Mass. Gen. Laws. Const.
Amend. Art. 2, § 6 (municipalities have broad powers of "home
rule"), *with id.* § 7 (limiting local power to impose imprisonment
as punishment for any violation of law); *cf. also Jacobsen*, 644
N.E.2d at 215 (discussing state legislative expansion of
authority for warrantless arrests for non-continuing misdemeanors
in context of domestic abuse).  Even if state statutory authority
is required, defendants say, it can be found in state provisions
permitting temporary detention in the case of various breaches of
the peace.  *See* Mass. Gen. Laws ch. 41, § 98; *id.* ch. 272, § 54.
    Interesting as these questions may be, they had no clear
answers at the time Humber detained Abrami, thus entitling him to
immunity under both state and federal law.  *Ahmad* v. *Dep't of
Correction*, 845 N.E.2d 289, 293 (Mass. 2006) (discussing

2. <u>Written Warning</u>

Abrami contends that the Noise Bylaw sanctions warrantless arrest only following a written warning.  The Bylaw, however, has lacked a warning requirement since it was amended in 1991.

3. <u>Malicious Prosecution</u>

Having found that Humber reasonably concluded there was probable cause for violation of the Noise Bylaw, I conclude that Abrami cannot maintain an action against him for malicious prosecution.  *See Goddard* v. *Kelley*, 629 F. Supp. 2d 115, 130 (D. Mass. 2009) (in action for malicious prosecution, "plaintiff must prove malice by showing that defendant knew there was no probable cause for the prosecution, and that he acted with an improper motive").

**C.  *Count II - Excessive Force***

The use of excessive force by police officers in the course of an arrest or investigatory stop constitutes an unreasonable seizure in violation of the Fourth Amendment, actionable under section 1983.  *See generally Graham* v. *Connor*, 490 U.S. 386 (1989).  I find no genuine dispute here, however, that Humber used a reasonable level of force in his interactions with Abrami.

Abrami complained of pain on his wrists and in his shoulders

---

application of qualified immunity for violations of both federal and Massachusetts law); *Santoni* v. *Potter*, 369 F.3d 594, 598 (1st Cir. 2004) (not clearly established whether lack of state law authority for arrest constitutes Fourth Amendment violation).

-23-

after he was handcuffed and as he was being supported by Humber while descending the stairs of the apartment building.  He admitted, however, that the hallway outside his apartment was narrow and that two people could not walk comfortably side-by-side, consistent with the need for Humber to follow behind him and the suggestion that Humber might have caused Abrami discomfort while guiding him down the stairs.  Moreover, Abrami never asked for medical attention and has provided no medical record of injuries hey may have sustained on October 1.

Perhaps most importantly for purposes of liability, Humber promptly responded to Abrami's complaints of physical discomfort when it became possible to do so.  *Cf.* *Burchett* v. *Kiefer*, 310 F.3d 937, 945 (6th Cir. 2002).  Even in Abrami's more colorful description in his interrogatory responses of having been "manhandled"--which I have ruled must be struck in any event, *see* Part III *supra*--there is no evidence that his discomfort continued once he arrived at the bottom of the stairs.  None of this amounts to Humber having subjected Abrami to unconstitutionally excessive force or generally having acted unreasonably at this stage of the incident.  Summary judgment must enter as to Count II.

## D.  *Count III - Substantive Due Process*

Abrami next argues that Humber and Tellier violated the substantive due process guarantee of the Fourteenth Amendment by

-24-

ordering intoxicated guests--particularly Caseres--to leave the
party, effectively inviting them to drive home drunk.  But
behavior rising to the "conscience-shocking level" sufficient to
violate substantive due process is typically found in "conduct
deliberately intended to injure in some way unjustifiable by any
government interest."  *Cnty. of Sacramento* v. *Lewis*, 523 U.S.
833, 834 (1998).  Here, the officers were acting in the
legitimate interest of quelling a disruptive party.  Moreover, it
cannot be said that the officers were forcing guests to drive
home drunk or that they were responsible for such activity.
Indeed, even without police intervention, the party guests would
have needed to make arrangements to leave the party at some
point, and hopefully those private arrangements would not involve
drunk driving.

Abrami finds particular fault in the officers' treatment of
Caseres, who was clearly intoxicated and had planned to spend the
night at the apartment.  Caseres, however lived less than a mile
away; the officers thus recognized that he did not have to drive
home.  Moreover, when Caseres would not leave the premises, the
officers left him "in charge" of the apartment, with Abrami's
consent.  In any event, Abrami also testified that a nearby
restaurant, where Caseres presumably could have taken the time to
sober up, would have been open at the time.  One searches the

record in vain for behavior amounting even to gross negligence, let alone behavior that shocks the conscience.

Summary judgment must enter as to Count III.

**E.  *Count IV - First Amendment Retaliation* / Equal Protection**

Little need be said of Abrami's claim that Humber arrested him in retaliation for exercising his First Amendment rights--specifically, in retaliation for criticizing the Amherst police department.  As earlier discussed, Humber reasonably concluded that arresting Abrami was supported by probable cause to believe he had violated the Noise Bylaw.  *See* Part III.B *supra*.  The Supreme Court recently confirmed that its April 2006 opinion in *Hartman* v. *Moore*, 547 U.S. 250 (2006), "injected uncertainty into the law governing retaliatory arrests." *Reichle* v. *Howards*, 132 S. Ct. 2088, 2096 (2012).  Thus at the time of Abrami's arrest in October 2006, "it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation." *Reichle*, 132 S. Ct. at 2097.  Regardless of whether a Fourth Amendment violation occurred, Humber is entitled to qualified immunity as to Abrami's First Amendment claim.

Abrami also makes vaguer allegations that he was deprived of equal protection of the laws, and that the officers impeded the due course of justice.[4]  Defendants affirm, however, that between

---

[4] Although not specifically pled, the latter appears to invoke 42 U.S.C. § 1985(2), which prohibits a conspiracy to

February 6, 2006 and October 1, 2006, Amherst police made at
least 180 arrests for violation of the Noise Bylaw.  Abrami has
made no showing that, in this instance, he was treated
differently than others similarly facing arrest for a noise
violation.

Summary judgment must enter on Count IV.

**F.  *Count V - MCRA***

Abrami charges all of the defendants with violating the
Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12,
§§ 11H, 11I.  The MCRA prohibits attempts to interfere, "by
threats, intimidation or coercion," with a person's exercise of
his civil rights.

The MCRA claim against Humber is not viable, however,
because there is no allegation that he threatened or coerced
Abrami into relinquishing his rights.  *Cf. Butler* v. *RMS
Technologies, Inc.*, 741 F. Supp. 1008, 1011 (D. Mass. 1990) (in
addition to deprivation of civil rights, defendant must have
coerced victim into relinquishing rights) (abrogated in part on
other grounds).  Abrami's claims against Humber are for "a direct
deprivation of rights"--for example, unlawful entry and arrest,
and use of excessive force in violation of the Fourth Amendment.
*Swanset Dev. Corp.* v. *City of Taunton*, 668 N.E.2d 333, 338 (Mass.

---

obstruct the due course of justice "with intent to deny any
citizen the equal protection of the laws."

1996).  A direct deprivation, "even if unlawful, is not coercive because it is not an attempt to force someone to do something the person is not lawfully required to do," and thus not actionable under the MCRA.  *Id.; cf. also Goddard*, 629 F. Supp. 2d at 128-29.

As for Officer Tellier and Police Chief Scherpa, there is no evidence of any threatening behavior or intimidation on their part, let alone threats made in an effort to interfere with civil rights.  *See also* Parts III.J and III.K *infra*.  Lastly, the Town is not an eligible defendant under the MCRA.  *Kelley* v. *LaForce*, 288 F.3d 1, 11 n.9 (1st Cir. 2002).

Summary judgment must enter on Count V.

**G.   Count VI - Unlawful Entry/Trespass**

For the reasons discussed in Part III.A *supra*, granting defendants summary judgment on Abrami's claim for unlawful entry in violation of the Fourth Amendment, summary judgment must also enter on his state law trespass claim.  *Cf. Com.* v. *Murphy*, 233 N.E.2d 5, 8 (Mass. 1968) ("A police officer who enters upon private premises in good faith in the performance of his official duty to protect life and property and to preserve the peace is not a trespasser.").

**H.   Count VII - False Imprisonment**

Summary judgment must enter on Abrami's claim for false imprisonment based on my determination that Abrami's grounds for

false arrest--including warrantless arrest in the home, lack of probable cause, and failure to provide a written warning--lack merit.  *See* Parts III.A and III.B *supra*.

## I.  *Count VIII - Assault and Battery*

For the reasons discussed in Part III.C *supra*, summary judgment must also enter on Count VIII.  *See Raiche* v. *Pietroski*, 623 F.3d 30, 40 (1st Cir. 2010) ("Where a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, our determination of the reasonableness of the force used under § 1983 controls our determination of the reasonableness of the force used under the common law assault and battery claims.").

## J.  *Count IX - Officer Tellier, Bystander Liability*

Abrami argues that Officer Tellier should be held liable for failing to prevent deprivation of his constitutional rights by Humber.  *See Clark* v. *Taylor*, 710 F.2d 4, 9 (1st Cir. 1983) ("Liability under section 1983 may be imposed both for action that deprives a plaintiff of a constitutional right and for failure to act, when there is a duty to act, to prevent such a deprivation.").  Given my conclusion that Humber is not liable for his primary conduct, however, Tellier cannot be subject to "bystander liability."  Summary judgment accordingly must enter on Count IX.

**K.  Count X - Police Chief Scherpa, Supervisory Liability**

Abrami's claim for supervisory liability against Police Chief Scherpa is also unfounded.  There is no evidence in the record of Scherpa's failure to train or supervise Humber properly, or of any failure to take appropriate disciplinary actions against him.  Moreover, the record provides no indication prior to the October 1 incident that Humber was likely to violate constitutional rights, such that Scherpa could have shown "reckless or callous indifference" to Abrami's constitutional rights through any supervisory failures.  *Febus-Rodriguez* v. *Betancourt-Lebron*, 14 F.3d 87, 92 (1st Cir. 1994); *see Camilo-Robles* v. *Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998) (to establish supervisory liability, "plaintiff must affirmatively connect the supervisor's conduct to the subordinate's violative act or omission" (internal quotation omitted)).

Abrami also suggests that Scherpa should be held liable simply for having implemented allegedly unconstitutional policies of the Town.  However, finding no such unconstitutional policies, *see* Part III.L *infra*, I conclude that Scherpa cannot be subject to supervisory liability on this basis either.

**L. Count XI - Town of Amherst**

Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), municipalities may be held liable under section 1983 "when execution of a government's policy or custom, whether made by its

lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694.   The Court has also held that "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable for such a failure under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).

Abrami presents no evidence of such an unconstitutional policy or custom that might have inflicted injury in the form of unlawful entry or resulting unlawful arrest--which are, again, the only claims as to which there remains a genuine dispute whether Humber deprived Abrami of constitutional rights.   To the contrary, Amherst policy department procedures explicitly warn officers about the limits on their authority to effect a warrantless entry based solely on a noise disturbance.

To the extent Abrami instead relies on an unconstitutional custom, there is no evidence in the record to support that theory. I address any suggestion that the Town should be held liable for promulgating an unconstitutional Bylaw in Part III.O *infra*, where I conclude the Bylaw is constitutional both on its face and as applied to Abrami.

## M. Count XII - Intentional Infliction of Emotional Distress

Abrami next charges all defendants with intentional infliction of emotional distress.   The Town, however, is immune from liability for intentional torts.   Mass. Gen. Laws ch. 258,

§ 10(c).  As to the individuals, none of the conduct alleged rises to the level of "extreme and outrageous" conduct as necessary for liability.  *Agis* v. *Howard Johnson Co.*, 355 N.E.2d 315, 318 (Mass. 1976).  I do not mean to minimize the importance of the privacy of the home.  But, even assuming there has been a Fourth Amendment violation, the alleged conduct falls short of being "beyond all possible bounds of decency" or "utterly intolerable in a civilized society," *id.* at 319, and fails to show that Humber--or any of the individual defendants--acted with "malice" towards Abrami, *Tetrault* v. *Mahoney, Hawkes & Goldings*, 681 N.E.2d 1189, 1197 (Mass. 1997).

## N. Count XIII - Negligence

I next turn to Abrami's charge of negligence against all defendants.  The individual defendants, acting as they were in their capacity as public employees, cannot be sued for negligence. Mass. Gen. Laws ch. 258, § 2.  As to the Town, Abrami failed to provide the Town with a letter of presentment of his claim, as required by Mass. Gen. Laws ch. 258, § 4.  Abrami argues that his March 22, 2007, appeal of his civil complaint against Humber constitutes a sufficient letter of presentment.  But Abrami's letter merely notified the Town of his appeal of claims against *Humber*, and gave no indication that he sought to pursue an independent claim against the Town.

**O.  Count XIV - Noise Bylaw**

Finally, Abrami challenges the constitutionality of the
Amherst Noise Bylaw itself.  He argues the Bylaw is void for
vagueness and unconstitutionally overbroad.

1.   Vagueness

An enactment is void for vagueness if its "prohibitions are
not clearly defined." *Grayned* v. *City of Rockford*, 408 U.S. 104,
108 (1972).  Requiring a "reasonable degree of clairty" in the
terms of legislative enactments serves the dual purposes of (1)
providing notice such that "individuals [may] conform their
behavior to the requirements of the law" and (2) "reduc[ing] the
risk of arbitrary enforcement." *Gresham* v. *Peterson*, 225 F.3d
899, 907 (7th Cir. 2000).  Accordingly, a law may be
unconstitutionally void for vagueness if it is "so vague that
[persons] of common intelligence must necessarily guess at its
meaning and differ as to its application," *Roberts* v. *U.S.
Jaycees*, 468 U.S. 609, 629 (1984) (modification in original), or
it "vests virtually complete discretion in the hands of the police
to determine whether the suspect has satisfied the statute."
*Kolender* v. *Lawson*, 461 U.S. 352, 358 (1983).

As described at the outset, the Bylaw prohibits "excessive,
unnecessary, or unusually loud noise which either annoys,
disturbs, injures, or endangers the reasonable quiet, comfort,
repose, or the health or safety of others within the town of

-33-

Amherst." A.T.B.L. art 2, § 3(1).  The Bylaw then goes on to
provide an illustrative but nonexhaustive set of "loud,
disturbing, injurious and unlawful noises."  The first, which was
applicable to Abrami, is the use of "electronic sound producing
devices, in such a manner or with volume at any time or place so
as to annoy or disturb the reasonable quiet, comfort or repose of
persons in any dwelling." *Id.* § 3(1)(a).  The next example
involves yelling, shouting and other loud noises on the public
streets between 11:00pm and 7:00am, as well as any other noise
that disturbs the "reasonable quiet." *Id.* § 3(1)(b).  Finally,
the Bylaw calls out frequent noise caused by animals that disturbs
the "reasonable comfort or repose of any person," *id.* § 3(1)(c),
and the use of "any drum or other instrument or device of any kind
for the purpose of attracting attention by the creation of noise,"
*id.* § 3(1)(d).

      According to Abrami, these provisions are unconstitutionally
vague because they are effectively defined by the "subjective
opinions of complaining citizens and police officials." *Dupres* v.
*City of Newport*, 978 F. Supp. 429, 433 (D.R.I. 1997) (internal
quotation and citation omitted); *cf. Langford* v. *City of Omaha*,
755 F. Supp. 1460, 1463 (D. Neb. 1989).  I disagree.

      To be sure, the primary prohibition of the Bylaw, A.T.B.L.
art. 2, § 3(1), could be more specific.  It could, for example,
more precisely define the contexts in which excessively loud noise

is prohibited.  The Bylaw could also, even more specifically, identify decibel levels appropriate in certain contexts and at certain times of day.  *Cf. Dupres*, 978 F. Supp. at 433.  But I do not find these specifications to be constitutionally required.

Although the words "excessively loud" or "reasonable quiet" are in some measure abstract, they are words that "have through daily use acquired a content that conveys to any interested person a sufficiently accurate concept of what is forbidden."  *Kovacs* v. *Cooper*, 336 U.S. 77, 79 (1949).  In case there was any doubt, however, the examples following the Bylaw's primary proscription highlight particular areas of concern:  electronic amplification, loud noises at night, and noise extending over long periods of time.  This alone goes a long way toward establishing adequate notice.

Also essential to the Bylaw is that its prohibition only applies to excessive noise that disturbs the "reasonable" quiet or repose of others.  Such a limitation ensures that the statute is not defined subjectively, but by the "common understanding and practices" of reasonable persons in the community.  *Cf. United States* v. *Woodard*, 376 F.2d 136, 141 (7th Cir. 1967).  The "reasonableness" limitation is helpful not only in providing notice, but also in preventing the statute from being defined by the personal whim or particular sensitivities of other citizens or the police.  *Cf. Sharkey's, Inc.* v. *City of Waukesha*, 265 F. Supp.

2d 984, 992 (E.D. Wis. 2003); *see also Howard Opera House Associates* v. *Urban Outfitters, Inc.*, 322 F.3d 125, 128 (2d Cir. 2003) (upholding prohibition on "loud or unreasonable noise," defined as that which "disturbs, injures or endangers the peace or health of another"); *Woodard*, 376 F.2d at 141.

I recognize that greater clarity may be necessary depending on the type and severity of the penalties imposed, and the extent to which an enactment potentially interferes with the right of free speech. *Gresham*, 225 F.3d at 908. Here, although the Bylaw imposes criminal penalties, they are typically limited to rather modest fines. A.T.B.L. art. 2, § 3(3). And, as discussed below, I find the free speech concerns implicated by the Bylaw attenuated at best.

Thus I conclude the Noise Bylaw, taken as a whole, expresses its proscriptions with a sufficient degree of clairty to avoid being invalidated on vagueness grounds. I also note, moreover, that Abrami likely was not eligible to bring this vagueness challenge in any event. "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker* v. *Levy*, 417 U.S. 733, 756 (1974); *Nat'l Org. for Marriage, Inc.* v. *McKee*, 669 F.3d 34, 42 (1st Cir. 2012). The conduct here involved electronically amplified music from a party, in an otherwise quiet neighborhood, that could be heard by neighbors and from the street at one o'clock in the morning, and that had

continued since eight o'clock the evening prior.  Such conduct is
plainly the type meant to be captured by the Noise Bylaw, leaving
Abrami ineligible to challenge the law on vagueness grounds.

    2.   Overbreadth

    In the First Amendment context, as incorporated against the
states by the Fourteenth Amendment, "a law may be invalidated as
overbroad if a substantial number of its applications are
unconstitutional, judged in relation to the statute's plainly
legitimate sweep."  *United States* v. *Stevens*, 559 U.S. 460, 130 S.
Ct. 1577, 1587 (2010) (internal quotation and citation omitted).
I conclude, however, that the Noise Bylaw poses no such problem of
illegitimate overbreadth.

    The Noise Bylaw "gives no license to punish anyone because of
what he is saying."  *Grayned* v. *City of Rockford*, 408 U.S. 104,
120 (1972).  Such a content-neutral regulation is valid as long as
it is "narrowly tailored to serve a significant governmental
interest" and "leave[s] open ample alternative channels for
communication of the information."  *Clark* v. *Cmty. for Creative
Non-Violence*, 468 U.S. 288, 293 (1984).

    No doubt because the government unquestionably has "a
substantial interest in protecting its citizens from unwelcome
noise," *Ward* v. *Rock Against Racism*, 491 U.S. 781, 796 (1989),
Abrami attacks the Bylaw as insufficiently "narrowly tailored."
In doing so, however, he blurs his arguments based on vagueness

-37-

and overbreadth.  Abrami again suggests that something akin to
context-specific decibel limitations would be necessary to make
the Bylaw constitutional.  *Cf. Dupres*, 978 F. Supp. at 435.  Such
a limitation would certainly be more specific and limit discretion
in enforcement.  However, a decibel limitation has little to do
with the whether the statute is tailored to reduce the amount of
protected speech it prohibits.  An excessively low decibel limit,
for example, would capture a wide swath of protected speech.  *Cf.*
*Sharkey's*, 265 F. Supp. at 995.  By contrast, the Noise Bylaw's
proscription of "excessive, unnecessary, or unusually loud noise"
that disturbs the "reasonable quiet" *by definition* seeks to
capture only expression that is "basically incompatible with the
normal activity of a particular place at a particular time."  *Id.*
at 116.  On this "crucial question," the Noise Bylaw passes with
ease, making clear that its provisions are constitutionally
permissible time-place-and-manner restrictions.  *Id.*

Abrami attempts to ratchet up the level of scrutiny by
pointing to the Bylaw's categorical exception for the "reasonable
use of amplifiers or loud speakers for public addresses which are
non-commercial in nature."  A.T.B.L. § 3(2)(c).  This provision,
he says, renders the statute content-based and subject to strict
scrutiny.  *Cf. Desert Outdoor Adver., Inc.* v. *City of Moreno*
*Valley*, 103 F.3d 814, 820 (9th Cir. 1996).

The Bylaw is content-based, however, only in the limited category of public addresses.  The content-based exemption involves an entirely different provision of the Bylaw from that which prohibited Abrami's conduct.  I recognize that the hallmark of an overbreadth challenge is an attack on an enactment as facially unconstitutional even though the enactment is constitutional as applied to the litigant bringing suit.  *See Bd. of Trustees of State Univ. of New York* v. *Fox*, 492 U.S. 469, 483 (1989) ("Ordinarily, the principal advantage of the overbreadth doctrine for a litigant is that it enables him to benefit from the statute's unlawful application to *someone else*.").  A facial overbreadth challenge, however, does not allow a litigant to benefit from the invalidation of entirely separate and severable provisions of an enactment.

When provisions of an enactment are severable, "[g]enerally, only that part of an ordinance that is constitutionally infirm will be invalidated."  *Desert Outdoor*, 103 F.3d at 821.  Whether provisions of a law are severable typically depends on the intent of the enacting body and the ability of the provisions to function independently of each other.  *See Ackerley Commc'ns of Massachusetts, Inc.* v. *City of Cambridge*, 135 F.3d 210, 215 (1st Cir. 1998); *Nat'l Adver. Co.* v. *City of Orange*, 861 F.2d 246, 250 (9th Cir. 1988).

Here, the Bylaw includes an express severability provision, A.T.B.L. art. 2, § 3(5), and the categorical exemption for noncommercial public addresses functions entirely independently of the primary prohibition on excessive noise disturbing the reasonable quiet, *id.* § 3(1).  Thus even if the Bylaw must be held to strict scrutiny based on the exemption for non-commercial public addresses, and even if that exemption constitutes unconstitutional content-based discrimination, the unconstitutional exemption is entirely severable.  What remains of the Noise Bylaw is the reasonable and content-neutral time-place-and-manner restriction, described above, under which Abrami was prosecuted.

### IV. CONCLUSION

For the reasons set forth more fully above, defendants' motion to strike, Dkt. No. 49, and motion for summary judgment, Dkt. No. 21, are GRANTED.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE